UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DANNY JOE BERG,                          )
                                         )
        Plaintiff,                       )
                                         )    No. 4:11CV1426 AGF/FRB
                                         )
        v.                               )
                                         )
                                         )
MICHAEL J. ASTRUE, Commissioner          )
of Social Security,                      )
                                         )
        Defendant.                       )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

        This matter is on appeal for review of an adverse ruling
by the Social Security Administration.  All pretrial matters were
referred to the undersigned United States Magistrate Judge,
pursuant to 28 U.S.C. § 636(b), for appropriate disposition.

**I.    Procedural Background**

        On February 2, 2009, plaintiff Danny Joe Berg
("plaintiff") applied for Disability Insurance Benefits ("DIB") and
Supplemental Security Income, alleging disability as of January 1,
2008. (Administrative Transcript ("Tr.") at 95-108).  Plaintiff's
applications were initially denied, and he requested and received
an administrative hearing before an administrative law judge
("ALJ"), which was held on March 2, 2010.  (Tr. 25-47).  On July
27, 2010, the ALJ issued his decision denying plaintiff's

applications.  (Tr. 8-21).

Plaintiff petitioned the Appeals Council for review. (Tr. 6-7).  He submitted additional evidence, consisting of a brief from his representative and records from Pathways Community Behavioral Healthcare, Inc., which were considered by the Appeals Council and made part of the administrative record.  (Tr. 4, 349-89).  On June 21, 2011, the Appeals Council denied review, stating that there was no reason to review the ALJ's decision.  (Tr. 1).  Under the regulations, when the Appeals Council denies review, the ALJ's decision stands as the Commissioner's final decision.  20 C.F.R. §§ 404.981, 416.1481; <u>Browning v. Sullivan</u>, 958 F.3d 817, 822 (8th Cir. 1992).

## II.    Evidence Before the ALJ

### A.   <u>Plaintiff's Testimony</u>

Plaintiff was represented during his administrative hearing.  Plaintiff testified that he lived with his wife and minor daughter in a rented trailer; that he was born in 1968; and that he had earned his GED and certification as a Certified Nurse's Assistant (also "CNA").  (Tr. 29-30, 35).  Plaintiff's work history over the preceding fifteen years included work as a CNA, restaurant owner, laborer and welder.  (Tr. 30).  Regarding the restaurant job, plaintiff explained that he and his wife had owned the restaurant, and that she was the manager and he was the assistant manager.  (Tr. 44).

Plaintiff testified that he could not leave his house without having tics or seizures, which he described as stiffening up and losing control of his bowels and bladder. (Tr. 31). Plaintiff stated that these episodes occurred daily, and that his last such episode had occurred that morning. (Tr. 31-32). Plaintiff stated that neurologists were unable to determine the cause. (Tr. 32). He stated that he took "all kinds of medication" including Haldol,[1] Lamictol,[2] Vasotec,[3] Vistaril,[4] Effexor[5] and Klonopin.[6] (Id.) Plaintiff stated that these medications were prescribed by Dr. Gowda, whom plaintiff saw once per month, but that the medications did not help at all. (Id.) Plaintiff testified that the episodes occurred at random and lasted from five to fifteen minutes, and that it took about 30 minutes to recover. (Tr. 33).

Plaintiff testified that he stopped working in January of

---

[1]Haldol, or Haloperidol, is used to treat psychotic conditions.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682180.html

[2]Lamictol, or Lamotrigine, is used to treat certain types of seizures.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695007.html

[3]Vasotec, or Enalapril, is used to treat hypertension.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695007.html

[4]Vistaril, or Hydroxyzine, is used to relieve the itching caused by allergies and to control the nausea and vomiting caused by various conditions, including motion sickness. It is also used for anxiety, and to treat the symptoms of alcohol withdrawal.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682866.html

[5]Effexor, or Venlafaxine, is used to treat depression.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a694020.html

[6]Klonopin, or Clonazepam, is used to control seizures and/or anxiety.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682279.html

2009 because his wife "said to apply for disability. She's an in home health nurse and she - - when you take out pills you can't have one of these ticks [sic] because you're going to be throwing pills everywhere and plus I'm embarrassed. So I don't even want to go out of my house." (Id.) Plaintiff testified that he had worked in a mental health home for mentally challenged people, and that work had been going well. (Tr. 34). Plaintiff testified that his boss and everyone there liked him, and that he had good work performance, in that he was on time and did everything he was supposed to do. (Tr. 34-35). Plaintiff stated that his episodes happened suddenly, and that on his alleged onset date plaintiff had an episode of 20 to 30 minutes in duration in which his brother, who is four times plaintiff's size, was trying to hold him down. (Tr. 35).

Plaintiff said he used a cane in case he started to have a seizure. (Tr. 34). He stated that his medication made him want to sleep. (Id.) He stated that his only current source of income was from his wife who worked in a mental health facility, and also testified that he receives Medicaid and food stamps. (Tr. 35-36).

Plaintiff testified that he did not sleep well and had no energy during the day, and that he spent his days sitting at home rocking back and forth or watching television. (Id.) Regarding housework, plaintiff testified that he swept and wiped tables, and that his daughter did the dishes. (Tr. 37). He testified that his wife cooked and did the grocery shopping. (Id.) He stated that he

used to enjoy mowing the lawn but did not do so anymore because he did not want to come out of his house, and that his landlord now mowed the lawn. (Tr. 37, 40). He testified that he did not do laundry. (Tr. 40).

Plaintiff testified that he left his house to go to the doctor and to the grocery store with his wife "once in a while" when she made him get out of the house. (Tr. 37). He stated that he used to go to church all the time, but just quit. (<u>Id.</u>) He testified that he was able to bathe and dress himself and could tie his shoelaces and use zippers, but that he had trouble with buttons. (Tr. 38). Plaintiff testified that he could read but had trouble concentrating. (<u>Id.</u>)

Plaintiff testified that, every day, he slept from two o'clock in the morning until three o'clock in the afternoon. (Tr. 38). Plaintiff stated that his condition was worsening, inasmuch as he increasingly did not want to leave his house and felt he was "becoming agoraphobic." (Tr. 39). He testified that a case worker from Pathways visited him to check in on him. (<u>Id.</u>) Plaintiff stated that he no longer had any desire to do things he once considered fun. (Tr. 40).

Plaintiff testified that he visited friends at their house and that friends visited him at his house, and that when he was around them, he did not have so many tics or shakes because he felt secure. (Tr. 41). Plaintiff stated that he talked on the telephone to his brother, sister, and mother. (<u>Id.</u>) He stated

that he was able to balance a bank account and had a cell phone, which he sometimes used to text. (Tr. 41-42). He stated that his family owned a small dog, but that he did not provide any of its care. (Tr. 41).

The ALJ then heard testimony from Julie Harvey, a vocational expert (also "VE"). The ALJ presented several hypothetical questions to Ms. Harvey, who testified regarding various jobs such a person could perform. (Tr. 44-46).

B.  Medical Records

Records from Community Health Center indicate that plaintiff was seen on June 26, 2008 for a complaint of depression. (Tr. 207). Plaintiff stated that he did not want to be left alone. (Id.) Upon examination, plaintiff was noted to have a normal appearance, and to be alert and oriented, in no acute distress. (Id.) Physical examination was normal. (Id.) Plaintiff was given Prozac.[7] (Tr. 207).

Plaintiff returned to Community Health Center on August 11, 2008 stating that he needed to discuss his depression and hypertension, and that he needed a refill on asthma medication. (Tr. 203). Plaintiff stated that he was not seeing much difference with his hypertension medication, and also stated that Prozac was helping but not enough, and plaintiff wanted the dosage increased.

---

[7]Prozac, or Fluoxetine, is used to treat depression, obsessive-compulsive disorder, some eating disorders, and panic attacks. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a689006.html

(Id.)  Upon examination, plaintiff was found to be alert and oriented, and in no acute distress.  (Id.)  The assessment was hypertension, asthma and depression, and plaintiff's medications were adjusted.  (Tr. 204).

On September 23, 2008, plaintiff returned to Community Health Center to be cleared to return to work.  (Tr. 200).  It is indicated that plaintiff had undergone a 24-hour hospital admission due to chest pain, and it is noted that a cardiac stress testing and cardiac enzyme testing was negative.  (Id.)  Plaintiff stated that he was not feeling tired or poorly, had no fever, no chills, and had a normal appetite.  (Id.)  He was alert and oriented and in no acute distress.  (Id.)  Evaluation of plaintiff's musculoskeletal system and mental status revealed normal findings.  (Tr. 201).  The assessment was cardiovascular disorder, and plaintiff was continued on his medications.  (Id.)  It is indicated that smoking cessation was discussed, and that plaintiff indicated that he was trying to quit on his own but would return if he desired medication to assist him.  (Id.)  It is indicated that plaintiff was given a work release to return to work.  (Id.)

On September 18, 2008, plaintiff presented to the emergency room at St. Mary's Health Center ("St. Mary's") with complaints of dizziness and shakiness that began that morning while walking to the bathroom at work, and was evaluated by Thomas Nittler, M.D. (Tr. 260).  Plaintiff stated he developed left upper chest pain that radiated to his shoulder and neck.  (Id.)

Plaintiff reported a history of asthma, diabetes controlled by diet, and hypertension. (Id.) Chest x-ray performed on September 18, 2008 revealed "old granulomatous disease" but no cardiopulmonary process. (Tr. 258).

Plaintiff returned to Community Health Center on September 29, 2008 with complaints of anxiety. (Tr. 199). He stated that at times, he felt he could jump out of his skin. (Id.) He was given Prozac and BuSpar.[8] (Id.)

On November 30, 2008, plaintiff presented to the emergency room of St. Mary's after having a seizure and was evaluated by Charles Judy, M.D. (Tr. 252). Plaintiff reported that he had had a seizure about four years ago and had undergone extensive workup, but that no cause had been determined. (Id.) Plaintiff reported that, for the past week, be had experienced almost daily headaches with visual blurring that appeared in the late morning to early afternoon and disappeared in the evening. (Id.) Plaintiff stated that he had experienced migraine headaches in the past, and that these headaches were different. (Id.) Plaintiff was taking Prozac and hydrochlorothiazide.[9] (Tr. 252). Upon examination, Dr. Judy noted that plaintiff was alert but mildly confused. (Tr. 253). A brain CT scan revealed no evidence

[8]BuSpar, or Buspirone, is used to treat anxiety disorders, or in the short-term treatment of symptoms of anxiety. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a688005.html

[9]Hydrochlorothiazide is a so-called "water pill" that is used to treat hypertension and water retention caused by various conditions, including heart disease. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682571.html

of any pathology. (Id.) Plaintiff underwent a brain CT scan on this date which revealed no significant findings. (Tr. 251). Dr. Judy noted that diagnostic studies did not point to any likely cause of the seizure, but that plaintiff's headaches may be variations of his migraine headaches that may have led to the seizure. (Tr. 253). Dr. Judy recommended that plaintiff start anticonvulsant therapy, and prescribed Dilantin. (Tr. 254-55). Dr. Judy recommended that plaintiff follow up with a neurologist, and counseled plaintiff to avoid driving and situations where he might harm himself, and gave plaintiff a work excuse to be off work that day. (Tr. 255).

On December 17, 2008, plaintiff was seen at Community Health Center and stated that he had experienced a seizure two weeks prior and had been given Dilantin,[10] but that it was not working. (Tr. 197). He was alert and oriented, and in no acute distress. He was diagnosed with benign hypertension, convulsive disorder, depression and anxiety. (Id.)

On January 1, 2009, plaintiff was taken to the emergency room at St. Mary's with complaints of having experienced "several seizures today," stating that he had had three seizures prior to the arrival of the ambulance. (Tr. 240). Plaintiff was evaluated

---

[10]Dilantin, or Phenytoin, is used to control certain type of seizures, and to treat and prevent seizures that may begin during or after surgery to the brain or nervous system.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682022.html

by Thomas Nittler, M.D.  (Tr. 240-42).  Dr. Nittler noted that he witnessed one seizure, and that the EMS crew reported witnessing seizures.  (Tr. 240).  All of these seizures lasted under one minute.  (Id.)  Dr. Nittler noted his own and the EMS crew's description of the seizures, which involved plaintiff "arching his back very briskly to the point that he lifts himself off the bed" but that there was no trembling or confusion.  (Id.)  Dr. Nittler noted that plaintiff was distractible during the seizures, and that the last one stopped with ammonia inhalant held under his nose. (Id.)  Plaintiff denied bowel or bladder incontinence.  (Tr. 240, 242). Following the seizures, he woke to be completely lucid and speaking.  (Id.)  Dr. Nittler noted that plaintiff was supposed to be on Dilantin 300 mg per day, but that plaintiff admitted that he was not taking it appropriately because it made him drowsy.  (Id.) Plaintiff admitted to smoking cigarettes, but denied using alcohol or taking illicit drugs.  (Tr. 241).  Upon examination, Dr. Nittler noted that plaintiff was awake, alert and oriented and in no acute distress.  (Id.)  Brain CT revealed only right maxillary sinus disease.  (Id.)  His Dilantin level was subtherapeutic.  (Id.)

Dr. Nittler wrote that, while plaintiff was observed to have episodes while in the emergency room, "[n]either of them appeared to be an actual seizure episode to me or my staff, though certainly the patient could have had true seizure activity in the past or even earlier today that I did not witness."  (Tr. 242). Dr. Nittler wrote that plaintiff was given an increased dosage of

Dilantin and was stable while in the emergency room, and was to take an increased dose the following day and then return to his normal Dilantin dosage. (Id.) Dr. Nittler opined that plaintiff should undergo an electroencephalogram, and should also follow up within the next week with his primary physician or with "Dr. Hooshmand" in the neurology department, to determine whether plaintiff had a tendency towards seizures or whether the episodes he was experiencing were "pseudoseizures." (Id.)

On January 5, 2009, plaintiff returned to Community Health Center and stated that he was having seizures with tic-like movements where he flexed his wrist and raised both arms to his eyes numerous times per day. (Tr. 196). It is indicated that plaintiff's hospital evaluation revealed only sinus problems. (Id.) He was noted to be in acute distress. (Id.) He was sent to the emergency room. (Id.)

Plaintiff presented to the emergency room at St. Mary's on January 5, 2009 and was evaluated by Mark Katsaros, D.O., for complaints of "seizure disorder or movement disorder." (Tr. 235). Dr. Katsaros noted plaintiff's history of visits to St. Mary's, and noted that plaintiff had not followed up with Dr. Hooshmand as recommended at his last emergency room visit, and that family members were unable to explain why plaintiff did not seek the recommended followup. (Id.) Dr. Katsaros noted that plaintiff had been seen earlier that day at the University of Missouri Hospital and clinic, and that his Dilantin level had been subtherapeutic and

medication was given to elevate it. (Id.) Dr. Katsaros also noted that, while at the University of Missouri facilities, it had been recommended that plaintiff have psychiatric evaluation for conversion disorder, but that plaintiff and his family refused it and presented instead to St. Mary's. (Tr. 242, 225).

Dr. Katsaros noted that plaintiff complained of a movement or seizure disorder. (Tr. 235). Plaintiff stated that he did not lose consciousness, and denied incontinence or grand mal seizure activity. (Tr. 235-36). Plaintiff's wife stated that plaintiff had the seizure activity during his sleep, and described it as involving both upper extremities with involuntary flexion of the upper extremities towards the head and neck, eye squinting, and turning the head to the left. (Tr. 235). Dr. Katsaros noted that plaintiff denied seizure activity in the past, and stated that he was not doing this intentionally. (Tr. 235-36). Plaintiff denied any personal or stressful problems, and denied any prior medical problems other than depression and hypertension. (Tr. 236). Dr. Katsaros noted normal findings upon examination with the exception of "what appears to be involuntary flexing of the upper extremities in a general direction of his head and neck with squeezing his eyes shut and turning his head and neck to the left." (Tr. 237). Dr. Katsaros wrote, "At 1 point, I did assess [plaintiff's] pulse in his right upper extremity for fairly lengthy time. [sic] [Plaintiff] did have 2 of his episodes while I was doing this, in which that he only moved his left upper extremity and his head and

neck.  There was no flexion of the right upper extremity with the distraction of me checking his pulse." (_Id._)  Plaintiff was admitted for a 23-hour observation to include neurological consultation. (_Id._)

Also on January 5, 2009, plaintiff was evaluated by Jeffrey Piontek, M.D.  (Tr. 225-27).  Dr. Piontek noted that plaintiff had presented for treatment at the University of Missouri for an onset of abnormal movement that began in the last week. (Tr. 225).  Dr. Piontek noted that plaintiff had undergone workup due to reports of seizures which had shown no intracranial pathology, and that plaintiff had also undergone cardiac workup which had been negative. (_Id._)  Plaintiff reported intermittent headaches, no chest pain, and no incontinence. (Tr. 226).  Dr. Piontek wrote "[d]uring the examination, he intermittently has choreoathetoid upper extremity movement but it does not seem to be going on whenever you enter the room.  His rapid alternating movements are intact.  There is no cogwheeling." (_Id._)  Dr. Piontek's impression was movement disorder and questionable history of seizure, possible pseudoseizure, and hypertension. (Tr. 227).

On January 6, 2009, plaintiff was evaluated by neurologist Ahmad Hooshmand, M.D. (Tr. 228).  Plaintiff reported experiencing episodes of jerky-type movements involving his face and both arms, described as suddenly bending his head forward and closing his eyes and bringing his arms to his face. (_Id._)  He did not become unconscious or confused, but the episode did worsen if

he tried to control it. (Id.) He denied that he fell or had any urinary incontinence or pain. (Id.) Dr. Hooshmand noted that it had been recommended that plaintiff see a psychiatrist, but that plaintiff had refused. (Tr. 228). Plaintiff reported that he was presently working in a mental health facility, and that his job involved distributing pills, cooking, and cleaning for about 12 hours per day. (Tr. 229). Plaintiff reported smoking one-half to one pack of cigarettes per day. (Id.) He reported no frustration or social, emotional or financial issues, and stated that his relationships were normal. (Id.) Plaintiff stated that he used to work in welding with his father, but quit that job because his father died of malignancy due to welding. (Id.) Plaintiff reported that he loved his present job. (Tr. 229). He stated that he liked living in the country and did not want to move to the city as would be required for him to make a living working with computers. (Id.)

Upon examination, Dr. Hooshmand noted that plaintiff was alert and oriented with no suicidal or homicidal thoughts. (Id.) Dr. Hooshmand noted that plaintiff had "rather frequent episodes of sudden onset of bending his head forward and closing his eyes and bringing up his arms around his head. These are very brief episodes and do not cause any interruption in the action of the patient if he is counting and does not cause any change in his color of complexion." (Tr. 230). Dr. Hooshmand noted that the event lasted "maybe 2 or 3 seconds and is repeated frequently."

(Id.)  Dr. Hooshmand noted that plaintiff did not respond to distraction, but that if plaintiff was speaking at the onset of one of the spells, he could continue to do so with no change in articulation.  (Tr. 230-31).  Dr. Hooshmand noted that plaintiff had no sphincter dysfunction.  (Tr. 231).  Dr. Hooshmand opined that plaintiff's presentation was "strongly suggestive of tic," and that plaintiff's presentation demanded that plaintiff had some underlying pathological abnormalities.  (Tr. 231-32).

On January 7, 2009, plaintiff was evaluated by Douglas J. Howland, D.O.  (Tr. 233).  Dr. Howland noted that MRI revealed opacity in plaintiff's right maxillary sinus, and that this finding had also been observed in a CT scan performed the preceding November, but that plaintiff denied nasal or sinus symptoms.  (Id.)

Also on January 7, 2009, plaintiff was evaluated by John W. Clemens, M.D.  (Tr. 262-66).  Plaintiff reported a history of grand mal-type seizures since 2002, and stated that he had had frequent seizures over the past two weeks.  (Tr. 265).  It is indicated that the last seizure was unwitnessed that day in the hospital with incontinence, and plaintiff also reported having a seizure the day preceding his admission.  (Id.)  Plaintiff stated that he was taking Dilantin, which normally worked well.  (Id.)  Plaintiff reported developing a tic movement disorder while playing a board game at his home, described as jerking type movements with grimacing.  (Id.)  Dr. Clemens noted that these occurred during the interview, and that plaintiff did not lose consciousness, but that

-15-

plaintiff reported that he had lost consciousness and suffered incontinence that morning. (Tr. 265). Plaintiff stated, "I need to get rid of these tics so I can get back to work." (Id.)

Plaintiff reported that he had been working for three to four months at Victorian Estates in Linn, Missouri, a group home. (Tr. 266). Plaintiff denied use of illicit drugs and alcohol, but stated that, each day, he drank more than two pots of coffee, three to four energy drinks, and caffeinated sodas. (Id.) He smoked one pack of cigarettes per day. (Tr. 267). He reported that he had been treated for depression episodically for six years. (Tr. 266). Plaintiff reported that his driver's license had been suspended secondary to driving without insurance, and that he was on probation for passing bad checks after the failure of his restaurant business, but was making restitution. (Tr. 267). Plaintiff stated that he quit welding work when his father died from complications related to welding, and plaintiff also acknowledged having trouble keeping a job. (Tr. 266). Plaintiff reported that his hobbies included fishing and hunting, and he stated that he enjoyed his job. (Tr. 267). He acknowledged that he had been told at the University of Missouri Hospital that he should see a psychiatrist, but did not do so because he did not want to wait around for hours. (Tr. 266).

Mental status examination revealed that plaintiff had pronounced tics of the upper extremities, body and head averaging every five minutes. (Id.) MRI was negative, and preliminary EEG

results were normal. (Id.) Plaintiff denied suicidal or homicidal ideation. (Tr. 268). Dr. Clemens noted that plaintiff's tics appeared "to be much more pronounced during pauses in the interview." (Tr. 267). He also noted that plaintiff was not distressed by the tics. (Tr. 268). Dr. Clemens opined that it was possible that plaintiff had a conversion disorder (a neurological disorder in which physical symptoms are unconsciously caused by a stressful or traumatic event), and that plaintiff was agreeable to observing a caffeine-free diet. (Id.) He adjusted plaintiff's medications. (Id.) When plaintiff was discharged, the only restrictions imposed were no use of alcohol, illicit drugs, or caffeine. (Tr. 274).

On January 12, 2009, plaintiff returned to Community Health Center and stated that he was having vocalizations with seizures. (Tr. 195). On January 21, 2009, plaintiff reported seizures, and redness and swelling of his left eye, which was determined to be conjunctivitis. (Tr. 193). Plaintiff indicated that seizures and tics were returning, and that he had been cleared to return to work the preceding Friday. (Id.)

On February 3, 2009, plaintiff presented to the emergency room at St. Mary's stating that he was hearing voices telling him that he was worthless, and stating that he had proposed killing himself that evening but that family members and law enforcement intervened and plaintiff was transported to the emergency room. (Tr. 270). Plaintiff denied experiencing recent seizures or losing

consciousness, and physical examination revealed no tics. (Tr. 271). Plaintiff stated that his bowel movements were normal. (Id.) When plaintiff was discharged, the only restrictions that were imposed were no alcohol consumption, no illicit drug use, and no caffeine. (Tr. 263).

Records from Pathways Community Behavioral Healthcare indicate that plaintiff was seen by Bhaskar Y. Gowda on April 20, 2009 with multiple complaints including anxiety, depression, hallucinations, mania, panic attacks, phobia of being alone, sexual dysfunction, and anger. (Tr. 337-38). Plaintiff indicated that he lived with his wife and daughter and that his wife worked and he was "waiting on SSI." (Tr. 343). He reported getting angry because he could not do things anymore and could not work, but stated that things were okay at home. (Id.) He was not suicidal or homicidal. (Tr. 340).

On April 30, 2009, Stanley Huston, Ph.D. completed a Psychiatric Review Technique form. (Tr. 293-304). Dr. Huston opined that plaintiff had both "mild" and "marked" limitations in the areas of restriction of activities of daily living and maintaining social functioning, and both "mild" and "moderate" limitations in maintaining concentration, persistence or pace. (Tr. 301). Dr. Huston opined that plaintiff's allegations were "mostly credible" and that plaintiff's mental disorders were severe but not expected to be severe for 12 months, and that plaintiff should improve significantly with treatment. (Tr. 303).

On May 7, 2009, plaintiff saw Dr. Gowda with complaints of many symptoms of depression, social phobia, obsessive and compulsive disorder, post-traumatic stress syndrome, agoraphobia and anxiety. (Tr. 331-32).

Records from the Medical Clinic of Owensville, the office of Dr. Stanley Keith, indicate that plaintiff was seen on May 12, 2009 with complaints of pitting edema in his legs, edema in his hands, and shortness of breath, but no chest pain. (Tr. 321). He reported smoking one pack of cigarettes per day. (Id.) Plaintiff was given medication and instructed to follow up in 10 days. (Id.)

On June 4, 2009, Dr. Gowda noted that plaintiff's mood and affect were anxious, and his thought content was delusional. (Tr. 331-32). On July 9, 2009, Dr. Gowda diagnosed major depressive disorder, and panic disorder without agoraphobia, and assessed plaintiff's Global Assessment of Functioning ("GAF") as 55.[11] (Tr. 326).

Records from Phelps County Regional Medical Center

---

[11]GAF scores are a measure of the clinician's judgment of the individual's overall level of functioning. See Diagnostic and Statistical Manual of Mental Disorders, DSM-IV, 30-32 (4th ed. 1994). GAF scores of 31 to 40 represent some impairment in reality testing, or serious impairment in several areas such as work or school, family relations, judgment, thinking, or mood; GAF scores of 41 to 50 represent serious symptoms or impairment in social, occupational or school functioning; scores of 51 to 60 represent moderate symptoms or difficulty in those areas; and scores of 61 to 70 represent mild symptoms with a reasonably good level of functioning. Id. at 32; see also Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010) ("According to the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), a GAF of 51 to 60 indicates moderate symptoms.") While the Commissioner has declined to endorse the GAF scale for use in determining entitlement to Social Security benefits, the scores may be used to assist the ALJ in assessing a claimant's level of functioning. Halverson v. Astrue, 600 F.3d 922, 930-31 (8th Cir. 2010) (internal citations omitted).

indicate that plaintiff was admitted on October 27, 2009 with complaints of hearing voices telling him to hurt others and himself, and of visual hallucinations. (Tr. 306). It was noted that a caseworker from Pathways had visited plaintiff at his home, and had recommended that plaintiff go to the hospital. (Tr. 308). Plaintiff was evaluated by Zulfikar Rasool Vali, M.D., who noted that plaintiff was presently unemployed and trying to get disability due to seizure, and that he had worked as a certified medical assistant and as a welder. (Tr. 306). Plaintiff reported that he had worked as a welder for most of his life until he was laid off, at which time he began working as a certified medical assistant. (Tr. 309). Plaintiff reported that he was presently on probation for writing bad checks. (Id.) Dr. Vali noted that plaintiff was disheveled and "smelled heavily," and that he had psychomotor retardation but no involuntary movements. (Id.) Plaintiff reported that he had undergone EEG evaluation which was normal, and had been diagnosed with pseudoseizure. (Tr. 309-10). Plaintiff reported that he had a history of abusing marijuana, cocaine, heroin, and ecstasy, and that he was an alcoholic, but that he had been sober for five years. (Tr. 306). Urine screen and blood alcohol testing was negative. (Id.) Plaintiff had apparently run out of medication, and was given Klonopin, Lisinopril,[12] Haldol, and Vistaril. (Tr. 310). Plaintiff requested

---

[12]Lisinopril, is used to treat hypertension.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a692051.html

a flu shot, and was given one.  (Id.)  Dr. Vali noted that plaintiff began showing improvement and requesting discharge.  (Tr. 306-07).  Plaintiff was discharged on October 30, 2009 with the discharge diagnoses of rule out schizophrenia and psychosis secondary to chronic drug use; seizure, rule out pseudoseizure; and chronic stressors.  (Tr. 307).

On December 7, 2009, plaintiff presented to the emergency room at St. Mary's with complaints of chest pain, reporting that he had had two "stress induced heart attacks" in the past, and was evaluated by Todd Rockett, M.D.  (Tr. 316).  Plaintiff stated that he had never undergone cardiac catheterization, which Dr. Rockett noted seemed "somewhat unusual if he indeed [had] a history of 2 previous myocardial infarctions."  (Id.)  EKG, chest x-ray, and laboratory testing  was normal, and it was noted that it was "unclear as to the etiology of his symptoms" but that he should be admitted and that cardiac stress testing should be performed.  (Tr. 317).  When plaintiff was discharged on December 8, 2009, it is indicated that he had no restrictions.  (Tr. 315).

C.   Evidence Considered by the Appeals Council[13]

On November 12, 2009, plaintiff saw Dr. Gowda and reported that he had been doing much better now.  (Tr. 379).  On December 10, 2009, plaintiff saw Dr. Gowda and reported that he had visited the St. Mary's emergency room with complaints of chest

---

[13]This evidence also contains records that were included in the administrative record before the ALJ.

pain, but that no cause for it had been found. (Tr. 378). On February 4, 2010, plaintiff saw Dr. Gowda and appeared to discuss his desire to go on disability. (Tr. 377). On September 16, 2010, plaintiff saw Dr. Gowda and stated that, the preceding evening, he had been interrogated by police on suspicion of abusing his daughter. (Tr. 372). Plaintiff stated that he was not sleeping well at night. (Id.) Dr. Gowda noted that plaintiff was very manipulative. (Tr. 373). On September 21, 2010, Wayne Brown of Pathways completed a Functional Skills Evaluation form. (Tr. 363-71). Plaintiff indicated that he was in the process of applying for disability and was frustrated with the process. (Tr. 364). Plaintiff reported having trouble in the past managing money and being on probation for writing bad checks. (Id.) Plaintiff stated that he was afraid to be around people, and that he was embarrassed by his seizure disorder and panic attacks, and that he had panic attacks when he was faced with change. (Tr. 364, 367, 370). He reported that he had worked as a Certified Medical Assistant from October 2008 to December 2008 and had worked "on and off as a Welder" before that, but had not worked at all since December of 2008. (Tr. 370). Another assessment was completed on September 24, 2010, in which plaintiff indicated that he was somewhat hopeful about change and his future. (Tr. 350). Much of this assessment form is blank. See (Tr. 349-62). A box is checked indicating that plaintiff had experienced difficulty performing work or work-like activity, but there is no narrative explanation included in the

space provided.  (Tr. 359).

    D.   <u>Other Evidence</u>

In a Function Report dated March 9, 2008, plaintiff indicated that he fed, watered, and walked pets.  (Tr. 125).  He indicated that he had no problems performing his personal care but needed reminders, and that he prepared sandwiches and simple meals for himself.  (Tr. 125-26).  He wrote that he did "some laundry and cleaning in the house" which took him "a couple of hours."  (Tr. 126).  He indicated that he went out two to three times per week, but did not drive due to seizures.  (Tr. 127).  He indicated that he enjoyed video games and fishing.  (Tr. 128).  Plaintiff indicated that his condition affected many activities such as lifting, squatting, walking, and the like.  (Tr. 129).

The record also contains a Function Report completed by Angelia Wyatt, plaintiff's mother-in-law, who indicated that plaintiff did laundry and took care of pets, but suffered from twitches and seizures that were sometimes so bad plaintiff wet himself.  (Tr. 159-67).  Ms. Wyatt wrote that plaintiff played video games which helped him concentrate.  (Tr. 166).

### III.    The ALJ's Decision

The ALJ found that plaintiff had not engaged in substantial gainful activity since his alleged onset date.  (Tr. 13).  The ALJ determined that plaintiff had the severe physical and mental impairments of convulsive disorder; major depressive

disorder, recurrent episode, severe, with psychotic behavior; anxiety disorder; and drug-induced psychotic disorder with delusions. (Tr. 13-14). The ALJ determined that plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (Tr. 16). The ALJ analyzed all of the medical and other evidence of record and concluded that plaintiff had the residual functional capacity (also "RFC") to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) with non-exertional limitations. (Tr. 17-18). The ALJ opined that plaintiff could: occasionally climb ramps and stairs, balance and stoop; never kneel, crouch, crawl and climb ropes, ladders or scaffolds; perform no work overhead; must avoid exposure to workplace hazards such as dangerous moving machinery or unprotected heights; cannot operate any moving vehicle; can frequently but not constantly use his upper extremities for grasping, handling, and fingering; can understand remember and carry out simple instructions; make simple work related decisions; deal with only occasional changes in work processes and environment; cannot work around the general public; and although not necessarily working in isolation, should be working with things rather than people and cannot work in close proximity to or in conjunction with co-workers. (Tr. 18). The ALJ determined that plaintiff was unable to perform his past relevant work, but that there were jobs that existed in significant numbers in the national economy that plaintiff remained able to perform. (Tr. 20-21). The

ALJ concluded that plaintiff was not under a disability as such is defined in the Act from his alleged onset date through the date of the decision. (Tr. 21).

## IV. Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that he is disabled. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001); <u>Baker v. Secretary of Health & Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42

(1987).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities.  If the claimant's impairment(s) is not severe, then he is not disabled.  The Commissioner then determines whether the claimant's impairments meet or equal one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If claimant's impairments are equivalent to a listed impairments, he is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work.  If so, the claimant is not disabled.  Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy.  If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test," however, is "more than a mere search of the record

for evidence supporting the Commissioner's findings." <u>Coleman v. Astrue</u>, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." <u>Id.</u> (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

<u>Stewart v. Secretary of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. <u>Coleman</u>, 498 F.3d at 770; <u>Warburton v. Apfel</u>, 188 F.3d 1047, 1050 (8th Cir. 1999).

However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. <u>Pearsall</u>, 274 F.3d at 1217 (citing <u>Young v. Apfel</u>, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." <u>Weikert v. Sullivan</u>, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); <u>see also</u> <u>Jones ex rel. Morris v. Barnhart</u>, 315 F.3d 974, 977 (8th Cir. 2003).

In the case at bar, plaintiff claims that the ALJ's decision is not supported by substantial evidence. In support, plaintiff notes the ALJ's finding that plaintiff could not work in close proximity to or in conjunction with co-workers, and argues that such a limitation would preclude the performance of the jobs listed in the ALJ's decision as examples of work plaintiff could perform, such as microfilm document preparer, printed circuit board assembler, and addresser. Plaintiff also argues that the ALJ erroneously failed to make findings regarding whether plaintiff could respond appropriately to supervision, co-workers and usual work situations and/or deal with changes in routine, inasmuch as the Pathways records document that plaintiff has such functional restrictions. Plaintiff also states that he suffers from impairments that would make it impossible for him to work as a microfilm document preparer, printed circuit board assembler and

addresser, and that the ALJ erroneously denied his claim because of opportunities for work that are merely conceivable and not reasonably possible. Plaintiff also contends that the ALJ erroneously considered his daily activities as indicating the absence of a disability, and failed to ask plaintiff about the intensity, persistence and limiting effects of his conditions. Finally, plaintiff contends that the ALJ failed to evaluate the combined effect of all of his impairments. In response, the Commissioner contends that the ALJ's decision is supported by substantial evidence on the record as a whole.

    A.    Credibility Determination

        In the case at bar, the ALJ wrote that he had considered all symptoms and the extent to which they could be reasonably accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. §§ 404.1529 and 416.929, and SSRs 96-4p and 96-7p, which correspond with the Eighth Circuit's decision in Polaski v. Heckler, 739 F.2d 1320, 1321-22 (8th Cir. 1984) and credibility determination. The ALJ analyzed the evidence of record and discredited plaintiff's allegations of symptoms precluding all work, noting several factors from the record detracting from his credibility. Plaintiff alleges that the ALJ's credibility findings are not supported by substantial evidence on the record as a whole because the ALJ erroneously considered his daily activities as indicating the absence of a disability, failed to ask plaintiff about the

intensity, persistence, and limiting effects of his conditions, and improperly rejected his allegations that he stiffened his body and voided his bowels and bladder during seizures and was afraid of people and of leaving his home. Review of the record, however, reveals that the ALJ properly considered all of the evidence of record, and that substantial evidence supports his credibility determination.

Before determining the claimant's residual functional capacity, the ALJ must evaluate the credibility of the claimant's subjective complaints. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007) (citing Pearsall, 274 F.3d at 1217). Testimony regarding pain and other symptoms is necessarily subjective in nature, as it is the claimant's own perception of the effects of his alleged physical impairment. Halpin v. Shalala, 999 F.2d 342, 346 (8th Cir. 1993). Because of the subjective nature of physical symptoms, and the absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect. Polaski at 1321-22. In Polaski, the Eighth Circuit addressed this difficulty and established the following standard for the evaluation of subjective complaints:

> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations

by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) functional restrictions.

Id. at 1322.

Although the ALJ may not accept or reject the claimant's subjective complaints based solely upon personal observations or upon the lack of objective medical evidence, the ALJ may discount them if there are inconsistencies in the evidence as a whole. See Id. The "crucial question" is not whether the claimant experiences symptoms, but whether his credible subjective complaints prevent him from working. Gregg v. Barnhart, 354 F.3d 710, 713-14 (8th Cir. 2003).

The ALJ is not required to discuss each Polaski factor as long as he or she "acknowledges and considers the factors before discounting a claimant's subjective complaints." Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009) (citing Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005)); see also Samons v. Apfel, 497 F.3d 813, 820 (8th Cir. 2007) (citing Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) (while the Polaski factors should be taken into account, "we have not required the ALJ's decision to include a discussion of how every Polaski 'factor' relates to the claimant's credibility.") "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination." Juszczyk v. Astrue,

542 F.3d 626, 632 (8th Cir. 2008); see also Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001).  The credibility of a claimant's subjective complaints is primarily for the ALJ to decide, and this Court considers with deference the ALJ's decision on the subject. Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005).

In the case at bar, the ALJ specifically acknowledged his duty to evaluate the intensity, persistence, and limiting effects of plaintiff's symptoms to determine the extent to which they limited his functioning, and noted that whenever statements about the intensity, persistence, or functionally limiting effects were not substantiated by medical evidence, he was required to make a finding on the credibility of statements based upon a consideration of the entire case record.  The ALJ then noted plaintiff's hearing testimony concerning the intensity, persistence, and limiting effects of his symptoms.  The ALJ noted plaintiff's hearing testimony that his seizures occurred daily, lasted five to 15 minutes and were followed by a 30-minute recovery period, and that his latest seizure occurred on the morning of the hearing.  The ALJ noted plaintiff's hearing testimony that he voided his bowels and bladder during his seizures, and plaintiff's reported daily activities.  The ALJ also noted the written statements of plaintiff and his mother-in-law regarding plaintiff's daily activities and abilities, as well as the statements that plaintiff was afraid to leave his home and feared that people were laughing at him or talking about him.

As the ALJ noted, extensive medical work-up, including EEG testing, failed to reveal an actual seizure disorder or any physiologic etiology for plaintiff's "seizures/abnormal movements." (Tr. 14). The ALJ also noted that plaintiff displayed "uncharacteristic symptoms and inconsistent symptoms." (Id.) These observations are supported by the record. As the ALJ noted, physicians and other hospital staff who observed plaintiff's episodes in January of 2009 indicated that the episodes did not appear to be actual seizures, and no medical personnel ever observed an episode of the duration and intensity plaintiff described during his hearing testimony. Although an ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003).

Plaintiff argues that the ALJ improperly discounted his allegation that he stiffened his body and voided his bowels and bladder during seizures. As the ALJ noted, however, the evidence of record contradicts plaintiff's allegations of seizures with stiffening of the body and loss of bowel and bladder control. On several occasions, plaintiff's episodes were witnessed by his medical treatment providers, who provided descriptions of the episodes in their treatment notes. In fact, Dr. Clemens witnessed several of plaintiff's episodes, stating that they occurred every

five to ten minutes. (Tr. 220). However, none of plaintiff's medical treatment providers described plaintiff as voiding his bowel or bladder or stiffening his body during the episodes. <u>See</u> (Tr. 222, 226, 237, 267-68, 275). Instead, plaintiff's medical treatment providers consistently described plaintiff's episodes as involving tics and jerking-type movements, and that plaintiff did not lose consciousness or bowel or bladder control, and remained able to speak during the episodes. Dr. Hooshmand described plaintiff's episodes as "very brief," (Tr. 230), in contrast to plaintiff's testimony that the episodes lasted five to 15 minutes with a thirty minute recovery period, and that one lasted for 20 to 30 minutes and that his brother had been required to hold him down. Dr. Hooshmand also noted that plaintiff's episodes caused no interruption in what plaintiff was doing at the time they occurred, observing that plaintiff was able to continue counting using a normal speaking voice. (<u>Id.</u>) Finally, plaintiff did not consistently report to his medical treatment providers that he voided his bowel and/or his bladder during his episodes, and instead routinely denied that he experienced bowel or bladder incontinence. (Tr. 125, 226, 228, 236, 240, 271, 311). Similarly, while plaintiff alleges that he requires a cane to keep himself from falling during an episode, he specifically reported to Dr. Hooshmand that he did not fall during his episodes. (Tr. 228). Plaintiff's subjective allegations that his episodes were of lengthy duration and were so severe that they involved stiffening

-34-

of the body and the loss of bowel and bladder control and required him to carry a cane to protect himself from falls are contradicted by the objective evidence of record. The ALJ did not err in discounting these allegations. Instead, the record supports the ALJ's conclusion that plaintiff tended to overstate the severity of his symptoms.

Plaintiff also contends that the ALJ improperly discredited his allegation that he did not want to leave his home and was afraid to be around people. However, as with plaintiff's allegations discussed above, these allegations are contradicted by the record. During his administrative hearing, while plaintiff indeed testified that he did not want to leave his house, he seemed to attribute this to embarrassment about his episodes and lack of motivation rather than to fear of people. <u>See</u> (Tr. 33, 37, 40). Plaintiff repeatedly told his medical treatment providers that he had a good relationship with his wife and family. He testified that he socialized with friends and family in person by going to their houses and by receiving them at his house, and also socialized via telephone. He told Dr. Gowda that he loved his job as a certified medical assistant, and he testified that he was well liked by the patients at the facility and by his boss. He wrote in his March 9, 2009 Function Report that he went out two to three times per week, and went shopping in stores two to three times per month for one to two hours at a time. This is consistent with his hearing testimony in which he stated that he accompanied his wife

to the grocery store when she made him get out of the house, and supports the conclusion that plaintiff was not as reluctant to leave his home as he suggests, and was in fact well able to leave his home with a little encouragement. In addition, while plaintiff testified that he did not engage in activities such as hobbies, recreational activities, or taking care of pets, he wrote in his March 9, 2009 Function Report that he had several hobbies, that he fed, watered and even walked his pet (which would involve leaving the house), and that he spent a couple of hours each day doing laundry and cleaning in the house. There is no evidence in the record that plaintiff's condition worsened since the time he completed his Function Report. In fact, on November 12, 2009, plaintiff told Dr. Gowda that he had been doing much better. (Tr. 324). See Perkins v. Astrue, 648 F.3d 892, 902 (8th Cir. 2011) (the ALJ was not required to adopt the claimant's unsupported subjective complaints and self-imposed limitations).

The ALJ did not, as plaintiff contends, erroneously consider plaintiff's daily activities as indicating the absence of disability. Instead, as required, the ALJ considered plaintiff's daily activities as one element of his entire credibility determination. See Polaski, 739 F.2d at 1322 (in addition to considering the absence of an objective medical basis supporting the degree of severity of subjective complaints, the ALJ should consider, inter alia, the claimant's daily activities).

The record contains other inconsistencies detracting from

-36-

the credibility of plaintiff's subjective complaints. On January 6, 2009, plaintiff told Dr. Hooshmand that he used to work in welding with his father, but quit welding after his father was diagnosed with malignancy that was believed to be related to welding work. (Tr. 229). However, on October 27, 2009, plaintiff told Dr. Vali that he stopped working as a welder because he was laid off. (Tr. 309). While certainly not dispositive, this evidence provides some support for the ALJ's conclusion that plaintiff tended to overstate his symptoms. See Ply v. Massanari, 251 F.3d 777, 779 (8th Cir. 2001) (it is proper to consider a claimant's inconsistent statements in determining his credibility). While plaintiff's medical treatment providers noted that he reported a history of depression, and while the record does contain discrete incidents of suicidal ideation and hallucinations, over time, plaintiff's mental status examinations were largely normal, and he was repeatedly noted to be alert and oriented. In addition, Dr. Gowda assessed a GAF of 55, indicative of only moderate limitations. See Halverson v. Astrue, 600 F.3d 922, 930 (8th Cir. 2010) (despite extreme limitations described in a Mental Residual Functional Capacity Questionnaire, multiple mental status examinations revealed no abnormalities, and the claimant was repeatedly noted to be alert and oriented).

As the ALJ noted, the medical evidence documents that plaintiff had problems in January 2009, April 2009 and late October-November 2009, but that his conditions responded to

treatment. See Davidson v. Astrue, 578 F.3d 838, 846 (8th Cir. 2009)(impairments that are controllable or amenable to treatment do not support a finding of disability).

The undersigned notes that, when plaintiff was seen by Dr. Katsaros in January of 2009, he admitted that he had failed to seek neurological evaluation of his reported seizures as had been recommended the last time he visited the emergency room. Plaintiff also admitted that he had refused to comply with the recommendation of his medical treatment providers at the University of Missouri Hospital that he undergo psychiatric evaluation because he did not want to have to wait to be seen. It is logical to conclude that, if plaintiff considered his conditions to be as serious and limiting as he alleges herein, he would have willingly submitted to the medical and psychiatric evaluations that he was told were necessary to address them. His failure to do so suggests that he did not truly view his conditions as limiting as he would have had the ALJ believe. Plaintiff's failure to follow recommended courses of treatment is one factor that weighs against his credibility. See Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008) (internal citations omitted).

As noted in the above summary of the medical information of record, plaintiff was repeatedly discharged with no work-related restrictions. The only restrictions imposed by his treatment providers were to avoid alcohol, illicit drugs, and caffeine. The

lack of significant work-related restrictions imposed by treating physicians supports the ALJ's decision.  See Brown v. Chater, 87 F.3d 963, 964-65 (8th Cir. 1996) (internal citation omitted) (the lack of significant restrictions imposed by treating physicians supported the ALJ's decision of no disability).

A review of the ALJ's credibility determination shows that, in a manner consistent with and required by Polaski, he considered plaintiff's subjective complaints on the basis of the entire record before him, and set forth numerous inconsistencies detracting from plaintiff's credibility.  An ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole.  Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990).  Because the ALJ in this case considered the relevant factors and gave good reasons for not fully crediting plaintiff's subjective complaints, his decision should be upheld.  Hogan, 239 F.3d at 962.

B.   RFC Determination

As noted above, the ALJ in this case determined that plaintiff retained the RFC to perform sedentary work with non-exertional limitations.  Despite plaintiff's allegations of error, review of the ALJ's decision reveals that he properly determined plaintiff's RFC and included therein only those limitations that were reasonably supported by the substantial evidence on the record as a whole.

Residual functional capacity is defined as that which a person remains able to do despite his limitations. 20 C.F.R. § 404.1545(a), Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001). The ALJ must assess a claimant's RFC based upon all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a); Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995); Goff, 421 F.3d at 793.

A claimant's RFC is a medical question, and there must be some medical evidence, along with other relevant, credible evidence in the record, to support the ALJ's RFC determination. Id.; Hutsell v. Massanari, 259 F.3d 707, 711-12 (8th Cir. 2001); Lauer, 245 F.3d at 703-04; McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. Hutsell, 259 F.3d at 712. However, although an ALJ must determine the claimant's RFC based upon all relevant evidence, the ALJ is not required to produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance. Pearsall, 274 F.3d at 1217 (8th Cir. 2001); McKinney, 228 F.3d at 863. The claimant bears the burden of establishing his RFC. Goff, 421 F.3d at 790.

Plaintiff argues that it was not permissible for the ALJ

to deny his claim because of opportunities for work that were merely conceivable and not reasonably possible. In support of this argument, plaintiff states that he suffers from physical and mental impairments that make it impossible for him to perform the work the ALJ described. However, as the Commissioner correctly notes, the mere presence of a physical and/or mental impairment does not demand a finding of total disability. See Trenary v. Bowen, 898 F.2d 1361, 1364 (8th Cir. 1990) (the mere presence of a mental disturbance is not disabling per se, absent a showing of severe functional loss establishing an inability to engage in substantial gainful activity). As discussed in detail above, the ALJ in this case conducted a legally sufficient credibility analysis, and rejected as inconsistent with the record as a whole plaintiff's subjective allegations of symptoms precluding all work. See McGeorge v. Barnhart, 321 F.3d 766, 769 (8th Cir. 2003) (the ALJ "properly limited his RFC determination to only the impairments and limitations he found credible based on his evaluation of the entire record.").

Plaintiff contends that the ALJ failed to inquire into the specifics of his activities of daily living and the intensity, persistence and limiting effects of his symptoms. As the Commissioner correctly notes, plaintiff does not identify what particulars the ALJ failed to investigate or how further inquiry would have changed the ALJ's decision. As discussed above, the ALJ

specifically wrote that he had considered the intensity, persistence, and limiting effects of plaintiff's conditions, citing plaintiff's extensive testimony on the subject. The administrative transcript also shows that the ALJ did question plaintiff regarding his daily activities and abilities. Contrary to plaintiff's allegations, the ALJ's decision shows that he conducted a comprehensive and detailed analysis of all of the evidence of record, including plaintiff's testimony regarding the intensity, persistence, and limiting effects of his conditions. Despite all of the foregoing inconsistencies detracting from plaintiff's credibility, the ALJ wrote that he was resolving all doubt in plaintiff's favor, and he indeed credited much of plaintiff's testimony regarding the limiting effects of his abnormal movements and mental issues. The ALJ was entitled to reject plaintiff's subjective allegations that he determined were inconsistent with the record as a whole. See McGeorge v. Barnhart, 321 F.3d 766, 769 (8th Cir. 2003) (the ALJ "properly limited his RFC determination to only the impairments and limitations he found credible based on his evaluation of the entire record.").

Plaintiff contends that the ALJ failed to make findings regarding whether he could respond appropriately to supervision, co-workers and usual work situations and/or deal with changes in routine. This argument is unavailing. The ALJ in this case addressed all of these limitations and included them in his

residual functional capacity assessment. The ALJ wrote that plaintiff was limited to understanding, remembering and carrying out simple instructions; making simple work-related decisions; dealing with only occasional changes in work processes and environment; could not work around the general public; should work with things rather than with people; and could not work in close proximity to or in conjunction with co-workers.

Plaintiff also contends that the ALJ failed to evaluate his impairments in combination. This argument is likewise unavailing. At step two herein, the ALJ acknowledged his duty to consider plaintiff's impairments singly and in combination. (Tr. 12). At step three, the ALJ specifically wrote that plaintiff did not have an impairment or combination of impairments that met or equaled the requirements of any listed impairment. (Tr. 16). The ALJ also wrote that he had considered plaintiff's mental impairments both singly and in combination, (Id.), and wrote that he determined that his residual functional capacity assessment "with its seizure precautions, limitations on use of upper extremities, limitations on mental work activity and work environment and postural limitations, takes into full account the claimant's credible allegations of limitations." (Tr. 19). "To require a more elaborate articulation of the ALJ's thought processes would not be reasonable." Browning, 958 F.2d 817, 821 (8th Cir. 1992) (citing Gooch v. Secretary of H.H.S., 833 F.2d 589,

592 (6th Cir. 1987)).

Plaintiff contends that there is no evidence in the record supporting the conclusion that he could perform work on a sustained basis for eight hours per day, five days per week. In support, plaintiff states that the medical evidence documents that he suffers from various conditions. However, as noted above, the mere presence of mental or physical impairments is not disabling; the claimant must make a showing of severe functional loss demonstrating the inability to engage in substantial gainful activity. <u>Trenary</u>, 898 F.2d at 1364. It is plaintiff's burden to establish his RFC. 20 C.F.R. §§ 404.1512, 416.912; <u>see also</u> <u>Baldwin v. Barnhart</u>, 349 F.3d 549, 556 (8th Cir. 2003); <u>Pearsall v. Massanari</u>, 274 F.3d at 1217. Plaintiff does not cite, nor does review of the record reveal, evidence establishing significant functional restrictions beyond those the ALJ specified in his residual functional capacity assessment, and an ALJ is not required to produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance. <u>Pearsall</u>, 274 F.3d at 1217.

A review of the ALJ's determination of plaintiff's RFC reveals that he properly exercised his discretion and acted within his statutory authority in evaluating the evidence of record as a whole. For the foregoing reasons, the undersigned determines that the ALJ's RFC determination is supported by substantial evidence on

the record as a whole.

C.   Vocational Expert Testimony

Plaintiff also states that he could not perform the jobs identified by the vocational expert because he cannot work in close proximity to or in conjunction with co-workers.   However, as discussed in detail above, the ALJ in this case conducted a legally sufficient credibility determination and included in his residual functional capacity assessment those restrictions he determined were credible.   See McGeorge, 321 F.3d at 769 (the ALJ "properly limited his RFC determination to only the impairments and limitations he found credible based on his evaluation of the entire record.").   During the administrative hearing, the ALJ posed the following hypothetical to the vocational expert:

> If you would consider a hypothetical individual same age, education and vocational background as the claimant who could perform the physical exertional requirements of sedentary work as defined by the regulations but who could only occasionally climb ramps and stairs, balance and stoop, who never should be climbing ropes, ladders or scaffolds, kneeling, crouching or crawling, who further should avoid all exposure to any sort of work place hazards like dangerous moving machinery or unprotected heights, further who should not be operating any sort of moving vehicle as a part of the job, further who shouldn't be doing any work over head, further who should - - could understand, remember and carry out simple instructions, make simple work related decisions, deal with only occasional changes in work processes and environment, shouldn't be working around the general public and again although not necessarily having to work in isolation but should be working with things rather than people and thus should not be working in close proximity to or in conjunction with co-workers.   Would there be any jobs available that such a hypothetical

individual could perform?

(Tr. 44-45).

In response, the vocational expert testified that such an individual could perform the jobs of addresser, microfilm document preparer, and film touch-up inspector. (Id.) The ALJ then asked the vocational expert whether there would be any effect on those jobs "if the hypothetical individual could frequently use the upper extremities for grasping, handling and fingering," and the vocational expert testified that such an individual would be unable to work as a film touch-up inspector because that job required continuous reaching, handling and fingering. (Tr. 45-46). The vocational expert testified that such an individual could, however, perform the job of printer circuit board assembler. (Id.) In his decision, the ALJ noted his questioning of the vocational expert and the responses received, and also wrote that the vocational expert's testimony was consistent with the information contained in the Dictionary of Occupational Titles.

Plaintiff raises no issues concerning the validity of the hypothetical questions the ALJ posed to the vocational expert. "A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ." Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001) (citing Prosch v. Apfel, 201 F.3d 1010, 1015 (8th Cir. 2000)). An ALJ may omit alleged impairments

from a hypothetical question when there is no medical evidence that such impairments impose any restrictions on the claimant's functional capabilities. Haynes v. Shalala, 26 F.3d 812, 815 (8th Cir. 1994). As explained, supra, substantial evidence supports the ALJ's credibility and RFC determinations. Likewise, his hypothetical questions included all the impairments he found to be credible. It was permissible for the ALJ to exclude "any alleged impairments that [he] has properly rejected as untrue or unsubstantiated." Hunt, 250 F.3d at 625 (citing Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997)).

Contrary to plaintiff's suggestions, because the ALJ's hypothetical questions included those restrictions he determined were credible and excluded those he had properly discredited, the vocational expert's testimony that plaintiff could perform the work specified was substantial evidence supporting the ALJ's determination that plaintiff could perform the jobs of microfilm document preparer, printed circuit board assembler, and addresser. See Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011); see also Strongson v. Barnhart, 361 F.3d 1066, 1072-73 (8th Cir. 2004)(the vocational expert's testimony constituted substantial evidence when the ALJ based his hypothetical upon a legally sufficient RFC and credibility determination).

D.   Appeals Council

In the section of his brief entitled "Conclusion,"

-47-

plaintiff states that "the decision of the Administrative Law Judge, Commissioner and the Appeals Council was not supported by substantial evidence." (Docket No. 11 at 14). To the extent plaintiff can be understood to allege error on the part of the Appeals Council, the undersigned notes that, in plaintiff's Complaint and brief, he alleges jurisdiction pursuant to 42 U.S.C. § 405(g), which limits this Court's jurisdiction to review of the Commissioner's "final decision." 42 U.S.C. § 405(g); Weinberger v. Salfi, 422 U.S. 749, 765 (1976); see also Browning, 958 F.2d at 822 (statutory jurisdiction is confined to review of the Commissioner's final decision). As noted above, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision thus stands as the Commissioner's final decision. 20 C.F.R. §§ 404.981, 416.1481; Browning, 958 F.3d at 822.

As noted above, in denying plaintiff's request for review, the Appeals Council considered additional evidence from Pathways. While plaintiff does not advance any arguments on the specific issue of whether the evidence the Appeals Council considered provides any basis for changing the ALJ's decision, the undersigned notes that, when the Appeals Council considers new evidence, this Court must decide whether the ALJ's decision is supported by substantial evidence on the record as a whole, which now includes that new evidence. Gartman v. Apfel, 220 F.3d 918, 922 (8th Cir. 2000) (citing Kitts v. Apfel, 204 F.3d 785, 786 (8th

Cir. 2000)).

In the case at bar, having considered the evidence considered by the Appeals Council, the undersigned determines that substantial evidence supports the ALJ's decision. As noted in the above summary of the medical information of record, the evidence includes assessments from Pathways and office visits to Dr. Gowda. This evidence documents little more than plaintiff's subjective complaints regarding his symptoms and limitations, subjective complaints that the ALJ properly considered discredited for legally sufficient reasons. While the Pathways assessments indicate, via a check mark in a box, that plaintiff had experienced limitations in his ability to perform work and work-like activities, they do not explain exactly what limitations plaintiff had, nor do they explain the manner in which the determination that plaintiff had work-related limitations was reached. In addition, Dr. Gowda wrote that he found plaintiff to be very manipulative, and it appears that plaintiff was benefit-motivated. It cannot be said that the additional evidence submitted to and reviewed by the Appeals Council undermines the ALJ's decision.

Therefore, for all of the foregoing reasons, on the claims that plaintiff raises, the undersigned determines that the Commissioner's decision is supported by substantial evidence on the record as a whole, and should therefore be affirmed. Because there is substantial evidence to support the decision, reversal is not

required merely because substantial evidence may support a different outcome, or because another court could have decided the case differently. <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir.2001); <u>Browning</u>, 958 F.2d at 821.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the Commissioner's decision be affirmed.

The parties are advised that they have until July 6, 2012, to file written objections to this Report and Recommendation. Failure to timely file objections may result in a waiver of the right to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).

_Frederick R. Buckles_
Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE

Dated this 22nd day of June, 2012.